*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0039p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOHN JOLLIFF; STEVEN DANIELS,

                    *Petitioners,*

     *v.*

NATIONAL LABOR RELATIONS BOARD,

                    *Respondent,*

TNT LOGISTICS OF NORTH AMERICA, INC.,

               *Respondent-Intervenor.*

No. 06-2434

_____

On Petition for Review of an Order
of the National Labor Relations Board.
No. 8-CA-33664-1

Argued: November 28, 2007

Decided and Filed: January 22, 2008

Before: BOGGS, Chief Judge; GIBBONS, Circuit Judge; and BELL, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Stacy Ann Hinners, LAW OFFICE OF MARC MEZIBOV, Cincinnati, Ohio, for Petitioners. Jason Walta, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. Rhonda Wilcox, FISHER & PHILLIPS, Atlanta, Georgia, for Intervenor. **ON BRIEF:** Stacy Ann Hinners, Christian A. Jenkins, LAW OFFICE OF MARC MEZIBOV, Cincinnati, Ohio, for Petitioners. Jason Walta, Linda Dreeben, Meredith L. Jason, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. James M. Walters, FISHER & PHILLIPS, Atlanta, Georgia, for Intervenor.

_____

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

1

---
**OPINION**
---

BOGGS, Chief Judge.  John Jolliff and Steven Daniels petition for review of the Order of the National Labor Relations Board ("Board") denying their claims arising under § 8(a)(1) of the National Labor Relations Act ("Act"), codified at 29 U.S.C. § 158(a)(1).  Administrative Law Judge ("ALJ") William G. Kocol originally found in the employees' favor, holding that the employees had been terminated for engaging in an activity–writing a letter complaining about working conditions–that was protected under the Act.  On review, the Board held that the employees' activities were stripped of the Act's protection because the letter contained a false statement made with actual malice.  Jolliff and Daniels now petition for review.  We grant their petition on the basis that the Board's decision was not supported by substantial evidence and remand the case to the Board.

I

John Jolliff, Steven Daniels, and Emerson Young were truck drivers for TNT Logistics of North America, Inc. ("TNT") at TNT's division at East Liberty, Ohio, until their termination on August 22, 2002.  Young had worked as a driver since 1990; during his term of employment he received numerous awards for safe driving and professionalism.  Prior to his termination, Young had never been disciplined.  Daniels had been a TNT employee since 1994 and Jolliff since 1995; both of these drivers also had received safe driving and performance awards.

In January 2002, Young contacted the United Auto Workers ("UAW") about organizing a union at TNT.  UAW officials advised Young to ready those workers who favored a union, but to wait until an organizing campaign at Honda, one of TNT's largest customers, became active.  In May 2002, dock workers complained to Young about their working conditions and asked to go forward in the process of obtaining union representation.  They also suggested sending a letter to TNT's higher management describing the conditions with which they took issue.  Young testified that eighty to ninety employees, about two-thirds of the workers, discussed sending the letter. Because Young had previously contacted the Union, the group agreed to give him their grievances on paper and he would "pick[] from that and put the letter together."  Jolliff and Daniels were among the group of workers expressing complaints.  Because the workers were afraid of retaliation, the group decided not to sign the letter as individuals.

On August 12, 2002, Young sent the letter to TNT's corporate management in Jacksonville, Florida.  He also sent a copy to Honda.  The letter, which contains certain grammatical, spelling, and formatting mistakes and irregularities, proceeds as follows:

> This letter is being sent to protest the management & managers at contracts 006 & 001.  We hope that our management at our home office will get an idea of how we the dock workers and truck drivers at these contracts are being treated & do something about it.
> Some of the things listed in this letter are just some of the many wrong things we feel are mistreatment & discrimination against our work force here by managers Robert Wheeler and Jeff Basinger.
> These are the poorest managers we have had in the history of these two contracts since our beginning in 1989.
> Mr. Wheeler is hardly ever here to listen to our problems when we need advise [sic] on problem solving.  He has lied to us on various occasions and we do not approve of this and many of his methods.  We feel he should be a better leader and manager.

We have lost a lot of business under Mr. Wheeler's management. He has done some good things for us, but the loss of business and leadership looms big.

Mr. Basinger came here with what appears to be his own personal gain for himself. He put up a wall to most people–mainly the drivers–under his contract. You do as I say or else.
Well it may be else as most people or drivers don't care for him. He believes he put TNT on the map here, well we know better.

We the dock workers & drivers of 006 & 001 are tired of being treated the way these 2 managers are doing us. We want to have a good & decent place to work and have a good relationship with our management here.

We have a list of some of the things that both managers have imposed on both dock workers and drivers and hope you will step in and help us to have harmony again.

*HEALTH*
We are given points for going to the doctors and or dentist even if we have a written excuse. We thought the company TNT wanted us to take care of our health. Lots of workers are showing up sick & then going home and getting 1/2 points so they don't get fired. Drivers are driving sick & tired and this is not safe or healthy. People are not taking care of or not given the time to see a dentist, this is totally uncalled for from managers. We bet you people don't have this problem.

*FUNERALS*
People are given points when they attend family funerals. This is about as low as any company can get. This is dirty period. Any funeral outside of a family is another story–you should or can get a point for that, but not inside your own family.

*LOG BOOKS*
Some drivers are being asked to fix their log books to make extra runs. These drivers are being asked by dispatchers and management to do these runs and either fix their log books or turn their heads on it.
Mr. John Cox once said he would not go to jail for fixing log books for anyone. Well Mr. Cox pack your suitcase, it has and is presently being done at 001.

*INSURANCE*
Our present insurance is the worst we have ever had and we feel that TNT needs to make a change in that as soon as they can–it is lousy.

These are just a few of the nasty things that are going on at these contracts. We hope TNT will make management changes at these contracts.

We the dock workers & drivers feel this needs to happen and the point system modified for health, sickness, & funerals.

We realize that there are some bad apples in every group–but don't punish good workers or their families, and don't let these managers dictate their lives. TNT says they are family oriented-prove it.

We just held the drivers re-bid meeting on the new routes and this is what happened, to not one but several of the drivers. When drivers went to bid on our new runs. Mr.

Basinger told these drivers these runs were already taken and he had other runs for them.
One driver asked who took the run he wanted and Mr. Basinger did not want to tell him who took it. But then asked again and Mr. Basinger told hm who got it and it turned out to be one of his friends from a previous contract.

Mr. Basinger finally said he was entitled to take the route since he had seniority over his friend.
He in turn did get the route.
That is dirty of Mr. Basinger to keep trying to put his friends & buddies in our jobs. We will not stand for this crap and you can count on that!!

One last thing on Mr. Basinger, a driver accidentally bumped into him in the office & Mr. Basinger told the driver to excuse himself and physically shoved the driver and hurt his shoulder & is having trouble with it. We all agreed that the driver should contact his attorney about this matter and take certain action against Mr. Basinger.

No one should have to be treated like this. This man is going to get hurt if he shoves the wrong person and it will be no ones [sic] fault but his own if he gets hurt.

We are 90% of the workers at these two contracts. We are together and have seeked [sic] outside help. We hope we can prevent bringing in or having to be represented by an outside organization. But we will have no choice if this treatment continues.

Remove managers, Wheeler & Basinger. It is not all about money, as it is working conditions such as no heat on the dock in the winters. You put up a new office in Florida–we bet it is heated and cooled both.

We the dock workers and drivers hope you will step in and resolve this matter with the management problem at 006 & 001 East Liberty, Ohio.

We are sending copies of this letter to the following parties:

Dave Kulik, President–TNT
Jeff Hurley, V President–TNT
John Cox, Safety Department–TNT
Scott Johnston, Honda of America

Copies and information to 2 television stations in Columbus Ohio to be aired at a later date if TNT Headquarters does not resolve this situation.

Because no employee wanted to sign individually, the letter indicated that it was sent from the dock workers and drivers at the East Liberty facility.

On August 21, 2002, the District Manager in charge of TNT's Honda operations, Robert Wheeler, called Young into his office. Wheeler asked Young if he had any problems with management; Young replied affirmatively and discussed his concerns about the company's recent route assignments and the disciplinary points assessed against employees. Wheeler told Young that there was nothing he could do about those issues because he had received the orders from "corporate."

The next day, Wheeler summoned Jolliff to his office. Kevin Schafter, a supervisor, was also present. Wheeler stated that a letter had been sent to corporate headquarters and to Honda. Wheeler proceeded to question Jolliff about his involvement with the letter. Jolliff denied that he had any information. Wheeler also questioned him about his grievances against TNT. Jolliff described some of the problems he was having with Basinger. At the end of the meeting Wheeler informed Jolliff that he was being placed on suspension and that, if the investigation cleared Jolliff, then he would be allowed to return to work.

Later that same day, Wheeler called Young back into his office. This time, Basinger and Schafter were also present. The three managers questioned Young about his involvement with the letter. Wheeler told Young that he had brought him into his office to fire him, but that he might be able to save Young's job and give him a short suspension instead if he cooperated. Wheeler then asked him what sort of things the dock workers had been talking about. Young gave a flippant response. Wheeler also asked what good would a union do for Young at this point in his life. When it became clear that Young was not going to reveal any information, Wheeler told him he could clean out his truck and that he was on extended suspension until further notice.

After Young left, Wheeler called Daniels into his office. As with Jolliff and Young, Wheeler questioned Daniels about his involvement in writing and sending the letter. The meeting was less confrontational than the meeting with Young, but the end result was the same. The managers suspended Daniels until the completion of the investigation.

On August 26, 2002, Young, Jolliff, and Daniels were fired. Their termination letters read:

> On August 20, 2002 our customer Honda Manufacturing North America received a letter signed by TNT Logistics North America, Drivers and Dock Workers, East Liberty, OH. The letter stated that management was mistreating employees, harassing employees and threatened the Customer (Honda) that if they did not do something they would turn the matter over to the local news stations (our customer is very sensitive to bad media coverage). The letter also directly threatened a Contract manager quote "This man is going to get hurt if he shoves the wrong person and it will be no ones fault but his own if he gets hurt." This letter violates TNT company policy 315-workplace violence. Also, sending a threatening letter of this nature to our customer puts TNT's reputation in a bad light and additionally could lead to a loss of business or failure to get new business and we can not tolerate that by any employee.

> Our company has an open door policy and for an employee to send a letter to our customer without contacting local management or Corporate Headquarters to work on their issues is inexcusable. This act cannot and will not be tolerated by TNT North America.

> We have it on reliable sources that you had a part in the writing and sending of this letter to our customer. This act jeopardized our entire operation and all employees' livelihood at this location.

> As of today August 26, 2002 we are terminating your employment with TNT Logistics North America.

After their termination, Young and Jolliff filed charges of unfair labor practices on September 11, 2002, and November 4, 2002, respectively. On January 23, 2003, the Board's General Counsel issued a formal complaint against TNT alleging that TNT violated § 8(a)(1) of the

Act by: (1) threatening an employee with discharge because of his union activities; (2) inviting an employee to resign because of the employee's union activities; (3) creating the impression that it was engaging in surveillance of the protected concerted activity of its employees; (4) interrogating employees concerning their protected concerted activities; (5) interrogating an employee concerning his union activities; and (6) suspending and then terminating employees John Jolliff, Emerson Young, and Steven Daniels because they engaged in protected concerted activity in the form of a letter that was sent to TNT's corporate management and to a customer.

Though Jolliff and Daniels were parties to the proceedings by virtue of having filed the underlying charges of unfair labor practices, they did not exercise their rights to retain counsel, call witnesses, introduce evidence, make oral arguments, or participate in the hearing other than as witnesses. On May 20, 2003, the General Counsel presented its case against TNT in a one-day evidentiary hearing before ALJ Kocol. During the hearing, Young, Jolliff, and Daniels testified on behalf of the General Counsel's complaint; Wheeler and Basinger testified on behalf of TNT.

On July 16, 2003, the ALJ issued a Decision and Order, finding that TNT engaged in unfair labor practices affecting commerce within the meaning of §§ 8(a)(1) and 2(6)-(7) of the Act.

On August 25, 2003, TNT filed exceptions with the Board, objecting to the ALJ's decision that the letter constituted "concerted activity protected by the act." The General Counsel filed a brief urging the Board to affirm the ALJ's decision.[1]

On July 24, 2006, more than three years after the ALJ issued his decision, the Board handed down a 2-1 Decision and Order reversing the ALJ and finding that "the employees' activity was not protected and, accordingly . . . that the employees were discharged for cause." J.A. 5; *TNT Logistics North America, Inc.*, 347 NLRB No. 55, slip op. 1; 2006 NLRB LEXIS 287 at *8-9 (2006). Therefore, under § 10(c) of the Act, 29 U.S.C. § 160(c), the Board could not uphold the reinstatement of the employees.

The Board focused on the question of whether the letter lost protection because it contained maliciously false or disparaging statements. At issue was the statement concerning the logbooks:

> Some drivers are being asked to fix their log books to make extra runs. These drivers are being asked by dispatchers and management to do these runs and either fix their log books or turn their heads on it. Mr. John Cox once said he would not go to jail for fixing log books for anyone. Well Mr. Cox pack your suitcase, it has and is presently being done at 001.

Board Chairman Robert Battista wrote the decision for the majority, which held that the employees' letter-writing was not protected on the grounds that the statement concerning the logbooks was "maliciously false":

> We find that the letter lost the protection of the Act because the statements in the letter accusing the Respondent of asking employees to "fix" the logbooks were maliciously false. The evidence supports a finding that the employees made this statement with knowledge of its falsity or at least reckless disregard for its truth. The employees' letter affirmatively represents that management "asked" employees to

---

[1] Although the General Counsel prosecuted the complaint against TNT in the evidentiary hearing and then urged the Board to affirm the ALJ's decision, the Board has delegated to the General Counsel the responsibility to resist petitions for review of Board orders. Thus, there is no contradiction between the General Counsel's position during the first hearing and before the board, and its position before this court.

"fix" logbooks, but employee Jolliff admitted that management never made such a request, and there was no evidence whatsoever to contradict this explicit admission.

While the Respondent changed the route times, this was hardly a request from management that employees fraudulently record their log book entries, as described by the employees in the letter. Yet, the letter made this factual representation to Respondent's single largest customer. Thus, the letter evinced, at the very least, a reckless disregard for the truth. Further, Jolliff's earlier statement during a safety meeting that management should be "disciplined" suggests that the employees intended to effectuate their desire to "discipline" management by disseminating a damaging and false accusation to a vital customer, one likely to be sensitive to allegations of willful disregard of transportation regulations by its carrier. Thus, contrary to our colleague, we find that this false accusation, in context, was more than mere "exaggeration."

*TNT Logistics North America, Inc.*, 347 NLRB No. 55, slip op. 2.[2]

While the board recognized that "only Young drafted the letter," it held that "inasmuch as the letter was unprotected, the concerted activity of [Young, Daniels, and Jolliff] was unprotected. *TNT Logistics North America*, *Inc.*, 347 NLRB. No. 55, slip op. 3 n.5.

The Board vacated the ALJ's order to reinstate Jolliff, Young, and Daniels, but affirmed the ALJ's other findings and holdings and ordered TNT to cease and desist from interfering with employees' union organizing activities. Peter C. Schaumber, the second Board member, concurred in part, writing separately to note that he would have held that the letter lost protection not only because it was maliciously false but also because it was disparaging. The third Board member, Dennis P. Walsh, dissented on the grounds that the statement concerning the logbooks was "at most . . . an exaggeration" and "hardly . . . deliberately or recklessly false." J.A. 9, *TNT Logistics North America*, *Inc.*, 347 NLRB No. 55, slip op. 5.

Following the Board's decision, Jolliff and Daniels petitioned this court for review of the decision. Young did not appeal. TNT intervened in support of the Board's request to deny the petition for review.

II

We must uphold the Board's findings of fact when "substantial evidence" in the record supports its findings. 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); *see also NLRB v. Brown-Graves Lumber Co.*, 949 F.2d 194, 196 (6th Cir. 1991) ("We uphold the Board's findings of fact where 'substantial evidence' in the record supports the Board's findings." (citation omitted)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

---

[2]In April 2002, the managers held a safety meeting during which Jolliff raised his concerns about the process of bidding for new routes. Jolliff suggested that management "ought to be disciplined . . . if they weren't going to get us routes." J.A. 160. The Board's interpretation of this comment was unreasonable given the context in which the statement was made. During his cross-examination Jolliff clarifies that wanted to know why the management was not being disciplined, presumably by Corporate headquarters, for *losing business*. An expanded discussion of this exchange is provided *infra* at Part III.

A reviewing court cannot engage in *de novo* review of the record. *Vencare Ancillary Servs. v. NLRB*, 352 F.3d 318, 321 (6th Cir. 2003) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). Nevertheless, it must consider the whole record and "take into account whatever in the record fairly detracts" from the weight of the evidence. *Universal Camera*, 340 U.S. at 488. "[T]he evidence supporting a Board conclusion may be less substantial when an examiner, such as an administrative law judge, has drawn conclusions different from the Board's than when the examiner has reached the same conclusion." *Litton Microwave Cooking Prods. Div., Litton Sys., Inc. v. NLRB*, 868 F.2d 854, 857 (6th Cir. 1989) (citing *Universal Camera*, 340 U.S. at 496). "The Board is free to find facts and draw inferences different from those of the ALJ but the reviewing court has an obligation to examine more carefully the evidence in cases where a conflict exists." *Pease Co. v. NLRB*, 666 F.2d 1044, 1047-48 (6th Cir. 1981) (citing *Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 820 (6th Cir. 1975)). When a case turns on witness credibility, we will not normally disturb the "assessments of the Board or an administrative law judge, 'who has observed the demeanor of the witnesses.'" *Litton Microwave Cooking Prods.*, 868 F.2d at 857 (quoting *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir. 1984)).

In addition to the obligation imposed by the existence of a conflict between the ALJ's and Board's decisions, this court has a second obligation to make an independent review of the record when a case involves protected speech. The Supreme Court in *Letter Carriers v. Austin*, 418 U.S. 264 (1974), wrote:

> The Court has often recognized that in cases involving free expression we have the obligation, not only to formulate principles capable of general application, but also to review the facts to insure that the speech involved is not protected under federal law. We must make an independent examination of the whole record so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.
>
> While this duty has been most often recognized in the context of claims that the expression involved was entitled to First Amendment protection, the same obligation exists in cases involving speech claimed to be protected under the federal labor laws.

*Id.* at 282.

### III

Jolliff and Daniels argue that (1) the logbooks statement was mere hyperbole and not capable of carrying a defamatory meaning; (2) even if the statement were construed literally, the Board did not have substantial evidence to conclude that it was made with actual malice; and (3) holding Jolliff and Daniels responsible for an allegedly false statement that they themselves did not make would have a chilling effect and would undermine the public policy promoting free and open debate in the context of labor disputes. We address the first two arguments and find that while the statement was capable of carrying a defamatory meaning, there was not substantial evidence of actual malice. Because we reverse the Board on this ground, we do not address Jolliff's and Daniels's chilling-effects argument.

### A. Prima facie protection for communications to third parties

Section 8(a)(1) of the Act provides: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in § 7 [codified at 29 U.S.C. § 157]." 29 U.S.C. § 158. Section 7 in turn provides that:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing,

and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in § 8(a)(3) [29 U.S.C. § 158(a)(3)].

29 U.S.C. § 157.

The Supreme Court in *Eastex, Inc. v. NLRB*, 437 U.S. 556 (1978), held that the "mutual aid or protection" clause of § 7 protects employees who "seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship." *Id.* at 565. The Court acknowledged that to hold otherwise:

> would leave employees open to retaliation for much legitimate activity that could improve their lot as employees. As this could 'frustrate the policy of the Act to protect the right of workers to act together to better their working conditions,' we do not think that Congress could have intended the protection of § 7 to be as narrow as [to exclude protection outside the employer-employee context].

*Id.* at 566-67 (quoting *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14 (1962)).

Our circuit has explicitly held that "[e]mployees have the right to engage in concerted communications with third parties regarding legitimate employee concerns, such as terms and conditions of employment and grievances." *Compuware Corp. v. NLRB*, 134 F.3d 1285, 1291 (6th Cir.), *cert. denied*, 523 U.S. 1123 (1998). Third parties can include the employer's clients or customers. *Ibid.*; *see also Handicabs, Inc. v. NLRB*, 95 F.3d 681 (8th Cir. 1996) (holding that a company policy violated the Act by prohibiting employees from discussing employment conditions with the company's clients.).

## B.  Loss of protection due to actual malice

"An employee's appeal to a third party or . . . a client only loses its protected status if the appeal does not relate to the labor practices of the employer or [is] maliciously false." *Compuware Corp.*, 134 F.3d at 1291. In *Linn v. United Plant Guard Workers*, 383 U.S. 53 (1966), the Supreme Court emphasized Congress's intent "to encourage free debate on issues dividing labor and management," noting that "cases involving speech are to be considered 'against the background of a profound . . . commitment to the principle that debate . . . should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks.'" *Id.* at 62 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Nevertheless, the Court also recognized that protection should not be extended to deliberately or recklessly false statements:

> "[T]he most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth. But it must be emphasized that malicious libel enjoys no constitutional protection in any context. After all, the labor movement has grown up and must assume ordinary responsibilities. The malicious utterance of defamatory statements in any form cannot be condoned, and unions should adopt procedures calculated to prevent such abuses.

*Id.* at 63.

In *Letter Carriers*, the Court reaffirmed the standard to be applied in deciding whether falsity stripped a statement of the Act's protection:

> The *Linn* Court explicitly adopted the standards of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and the heart of the *New York Times* test is the requirement that recovery can be permitted only if the defamatory publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280.

*Letter Carriers*, 418 U.S. at 281.

In addition to the "actual malice" standard of *Sullivan*, other aspects of defamation law have been imported into the analysis of whether a statement is protected under the Act. These include the fact-opinion distinction and the fact-hyperbole distinction:

> Moreover, expressions of opinion, though false, and couched in very strong language, are not to be treated as falsifications of facts. [*Letter Carriers*, 418 U.S. at 284] Likewise, the use of hyperbole which would not be treated by a hearer or reader as intended to be literally believed is not actionable. *Id.* This court has held highly offensive language protected by § 7 of the Act, where it is clearly used in a rhetorical rather than a literal sense. *NLRB v. Container Corp. of America*, 649 F.2d 1213 (6th Cir. 1981) (per curiam).

*Davis Co. v. United Furniture Workers*, 674 F.2d 557, 562 (6th Cir. 1982).

Thus, there is a two-part inquiry for determining whether the contested logbooks statement loses the Act's protection. First, the Board must determine whether the logbooks statement was false within the context of defamation law, meaning that the statement was capable of a defamatory meaning (as opposed to being pure opinion, hyperbole, or rhetorical exaggeration) and that it was actually false. Second, if the statement was false in the context of defamation law, then the Board must ask whether it was made with actual malice.

## C. Falsity

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the Supreme Court declined to create a specific exception to defamation claims for statements of opinion. It reasoned that such an exception was unnecessary because the *Bresler-Letter Carriers-Falwell* line of cases "provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20 (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988)). The Court further affirmed that "rhetorical hyperbole, a vigorous epithet" and "loose, figurative, or hyperbolic language" merit protection. *Id.* at 17, 21.

### 1. Capable of Defamatory Meaning

Whether a communication is capable of bearing a particular meaning is a question of law. *Clark v. American Broadcasting Cos.*, 684 F.2d 1208, 1213 (6th Cir. 1982). In *Milkovich*, the Supreme Court did not explicitly detail a test. Rather, the Court affirmed that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection" and that "statements that cannot 'reasonably [be] interpreted as stating actual facts,'" are not actionable. *Milkovich*, 497 U.S. at 20 (citing *Falwell*, 485 U.S. at 50). The Court then relied on the "general tenor" of the context in which the statement was made in determining whether it was "sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury." *Ibid.*

Our circuit has had few occasions to apply *Milkovich*'s distinction between statements capable of a defamatory meaning and protected hyperbole. In *Compuware Corp. v. Moody's*

*Investors Servs.*, we held that a credit rating, an opinion of a business's financial health, did not communicate any provably false factual connotations. 499 F.3d 520, 529 (6th Cir. 2007). In *Boladian v. UMG Recordings, Inc.*, 123 F. App'x 165 (6th Cir. 2005), we held that the lyrics of a song "Speed Dreamin'," performed by famous funk musician, George Clinton, did not convey "an actual, objectively verifiable defamatory statement . . . that could be proven." *Id.* at 170 . In *Parks v. LaFace Record*s, 329 F.3d 437 (6th Cir. 2003), we considered the allegedly defamatory lyrics of another song, Outkast's "Rosa Parks." We held that the song was "plainly not about Parks in any biographical sense of the term, and certainly does not make any factual statements about her. As there is no factual statement about her, Parks cannot show even the first element of a defamation claim." *Id* at 462.

In each of these cases, our inquiry into the fact-hyperbole distinction was abbreviated by the obvious nature of the statements at issue. Given our limited consideration of *Milkovich*, this Circuit has not yet articulated a specific test for determining whether a statement is susceptible to defamatory interpretation. This case, however, necessitates a closer reading of *Milkovich* because it hinges on this very issue. The First, Second, Fourth, and Ninth circuits have been confronted with the question of how to apply *Milkovich* and have identified factors that should be considered in making the fact-hyperbole distinction.

The Ninth Circuit has adopted a three-factor test, which examines: (1) whether the defendant used figurative or hyperbolic language that negates the impression that the defendant was asserting an objective fact; (2) whether the general tenor of the entire work negates that impression; and (3) whether the statement at issue is capable of being proved true or false. *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990).

The First Circuit distilled from *Milkovich* a similar set of factors, noting that while the case "eschew[ed] the fact/opinion terminology, *Milkovich* did not depart from the multi-factored analysis that had been employed for some time by lower courts seeking to distinguish between actionable fact and nonactionable opinion." *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 727 (1st Cir. 1992).

The Second Circuit also considers (1) content, (2) verifiability, and (3) context in determining whether a statement has a potentially defamatory meaning:

> The content factor requires a court to examine the "fair and natural meaning" that ordinary persons of reasonable intelligence would ascribe to the statement. The verifiability factor focuses on whether the statement was one of objective fact or subjective opinion - the more subjective the statement, the less likely it is to have a defamatory meaning. Finally, courts must consider the impression created by the statement, as well as the general tenor of the expression.

*Lee v. Bankers Trust Co.*, 166 F.3d 540, 546 (2d Cir. 1999) (internal citations and quotation marks omitted).

Finally, the Fourth Circuit examines "the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made." *Lapkoff v. Wilks*, 969 F.2d 78, 82 (4th Cir. 1992).

Examining our sister circuits' interpretations of *Milkovich* and the case itself, we discern at least four factors that a court should consider in determining whether a statement is protected hyperbole or is capable of carrying a defamatory meaning:

> (1) The common usage or meaning of the allegedly defamatory words themselves, whether they are commonly understood to be loose, figurative, or hyperbolic words;

(2) The degree to which the statements are verifiable, whether the statement is objectively capable of proof or disproof;

(3) The immediate context in which the statement occurs; and

(4) The broader social context into which the statement fits.

Applying these four factors, we hold that the logbooks statement was sufficiently factual to be capable of carrying a defamatory meaning.

a. The common usage or meaning of the allegedly defamatory words themselves

Jolliff testified at the hearing that the company had established new time standards for driving routes and that because the drivers' performance bonuses were tied to completing routes within the allotted time, the new standards created pressure for the drivers either to drive illegally or to falsify the logs. While Jolliff and Daniels concede that TNT "did not expressly instruct drivers to fix their logs," they argue that "TNT's impossible time allotments presented drivers, in their estimation, with an untenable choice: either drive unsafely and be on time, or drive safely and fudge the records." Br. of Pet'rs 17. Under this theory, the use of the word "asking," as opposed to "condoning" or "pressuring," could be interpreted as hyperbole. The dissenting Board member, Walsh, reached this conclusion, writing, "[a]t most . . . the letter's statement that management was asking employees to fix their logbooks was an exaggeration . . . ." *TNT Logistics North America, Inc.*, 347 NLRB No. 55, slip op. 5. Nevertheless, this argument is not particularly convincing.

In *Cafeteria Employees Union v. Angelos*, 320 U.S. 293 (1943), the Supreme Court concluded that "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies–like 'unfair' or 'fascist'–is not to falsify facts." *Id.* at 295. In *San Juan Hotel Corp.*, 289 NLRB 1453 (1988), the Board found that a leaflet's "references to the trustee as a 'Dictator' and as 'Robin Hood' [were] obvious rhetorical hyperbole." *Id.* at 1455. In *Great Lakes Steel, Div. of Nat'l Steel Corp. v. NLRB*, 625 F.2d 131 (6th Cir. 1980), a pamphlet described the details of a recent fatal accident of a fellow employee, then characterized the company's ambulance policy as a "murderous" and urged the employees to unite and stop the "murder for profit." *Id.* at 132. The Board found that the use of the word "murder" in this context was mere hyperbole. *Ibid.* At issue in *NLRB v. Container Corp. of America*, 649 F.2d 1213, 1214 (6th Cir. 1981), was a newsletter that criticized the company's grievance process. The notice alleged that management had treated employees in a "disgraceful manner," called the general manager a "slave driver," and stated that the general manager expected more "footage from the 'chain gang' with nothing in return." *Id.* at 1214. The ALJ held that the statements were protected rhetoric. The Board adopted the ALJ's recommended order and our circuit affirmed. *Id.* at 1216.

The words used in the cases discussed above–fascist, dictator, murderer, slave driver, and chain gang–are words that "would not be treated by a hearer or reader as intended to be literally believed." *Davis Co.*, 674 F.2d at 562. The statement at issue in this case, however, is different. The common meaning of "fix their log books" and "being asked by dispatchers and management to do these runs and either fix their log books or turn their heads on it" does not suggest hyperbole.

Furthermore, the letter implied that John Cox, the safety manager for TNT, might be held legally accountable for the log fixing, "Mr. John Cox once said he would not go to jail for fixing log books for anyone. Well Mr. Cox pack your suitcase, it has and is presently being done at [East Liberty]." J.A. 45. This also suggests that the logbooks statement was meant to be taken literally.

b.  The degree to which the statement is verifiable

The claim about falsification of the logbooks was verifiable.  Indeed, the record reflects that TNT investigated those claims.  This distinguishes the logbooks statement from the other examples of protected statements, such as the claim in *Container Corp. of America* that the General Manager expected more "footage from the 'chain gang' with nothing in return."  Verifiability suggests that the statement is capable of a defamatory meaning.

c. The context in which the statement occurs.

The statement was made in the context of a letter listing TNT's employees' complaints about company policy.  This makes the letter different from leaflets, pamphlets, or organizing slogans meant to excite workers or rally their support for a union protest or organizing campaign.  The letter closed with the statement, "[w]e the dock workers and drivers hope you will step in and resolve this matter with the management problem at 006 & 001 East Liberty, Ohio."  It is clear that Young was trying to communicate the employees' specific concerns, as he understood them, in way that would encourage management to resolve the issues.  Thus, the context of the statement also suggests that the statement was meant to be taken literally.

d.  The broader social context into which the statement fits.

"Federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Letter Carriers*, 418 U.S. at 283.  This acceptance reflects a broad societal recognition that labor disputes are heated affairs that may abound with rough language and intemperate, even inaccurate, statements.

Nevertheless, the letter was neither addressed to the general public nor to a fevered audience; it was addressed to three named corporate officers at TNT and a single corporate officer at Honda. Society generally distinguishes between the kind of statements made in private or semi-private communications from those statements made in more public settings such as protests, strikes, or organizing campaigns.  We recognize that speech occurring in the latter setting is more likely to be rhetorical and exaggerated, as its purpose is different from that of one-on-one communication. Given this social setting, a private or semi-private communication, it is more likely that the statements were intended to be taken literally as accurate statements of the drivers' and dock workers' complaints.

Weighing the four factors above, we hold that the logbooks statement was sufficiently factual in nature to be capable of a defamatory meaning.

2. *Substantial evidence of actual falsity*

Having decided that the logbooks statement was capable of carrying a defamatory meaning, the next step in our inquiry is whether the statement was actually false.  On appeal, the Board argues that Jolliff and Daniels "largely concede that, taken literally, the statement in the letter" was not true. Br. of Resp. 20.   Though this concession was made in the context of Jolliff's and Daniels's argument that the logbooks statement was hyperbole, Br. of Pet'rs 17,  because Jolliff and Daniels do not contest this point, we proceed as if the logbooks statement was false.

However, we note that the underlying record is surprisingly thin on the matter. First, Young did not testify as to the veracity of the statement. Second, the witnesses for TNT did not testify as to the falsity of the statement.[3]

At common law, defendants who rely upon the truth of the defamatory matter as a defense have the burden of proving that the statements were indeed true. Restatement (Second) of Torts, § 613, cmt. j. Applying this rule here, where TNT asserted that the statement was false, both the ALJ and the Board should have found that the General Counsel did not meet the burden of establishing the truth of the statement. Thus, the statement should have been presumed to be false. Unfortunately, neither the ALJ nor the Board provided this sort of detailed analysis. Instead, the ALJ skirted the issue, and the Board outright concluded that the statement was false, as opposed to merely holding that the General Counsel had not proved that the statement was true.

Even though the Board's method of analyzing the question of the truth or falsity of the statement was faulty, the ultimate result, that truth had not been established as a defense, was correct. Nevertheless, we highlight the thinness of the record on this matter to encourage future ALJs and Board members to be more precise in their fact finding and the application of the law thereto.

## D. Actual malice

To make a statement with actual malice one must either (1) have knowledge that the statement is false or (2) have reckless disregard for whether or not the statement is false or not. *Sullivan*, 376 U.S. at 280.

All three employees, including Young, testified that: (1) it was the idea of the group to draft a letter; (2) Young was the person who was chosen to draft the letter and who actually drafted it; and (3) while Jolliff and Daniels provided input, they did not review the letter before Young mailed it. It is also clear from Young's testimony, which the ALJ found credible, that he received input from other employees in drafting the letter, that not everything expressed in the letter came from Young's personal opinion or experience, and that not every item could be attributed to Jolliff or Daniels.

Furthermore, in response to Young's being asked if knew or had reason to know that there were any false statements in the letter, he testified as follows:

Q. To your knowledge, does that letter include any false statements?

A. No.

Q. Any reckless statements?

---

[3]The Board's brief erroneously states that Wheeler "testified that the Company conducted an audit of its logbooks after the letter was sent and found no falsification." Br. of Resp. 2. An examination of their citation, however, reveals that Wheeler was actually prevented from testifying as to the result of the audit:
Q: So is it fair to say that Mr. Hurley was there to address the substance of the complaints?
A. Yes. During the–during that time he also–uh, scheduled a safety audit with our safety department, to come up and do a DOT audit on our facility, to make sure that there is no–there was no falsification of logs or any violations of that sort.
Q. Was that – was that investigation conducted?
A. Yes.
Q. What was the result that investigation, if you know?
A. There was.
MR. BINSTOCK: Objection. That just goes beyond the scope of my [cross].
JUDGE KOKOL [sic]: Sustained

A. No.

Q. Any malicious statements?

A. No.

Q. To the best of your knowledge, is the information in there true and correct?

A. It sure is.

Q. To the best of your belief?

A. Yes.

On the basis of the testimony of Young, Daniels, and Jolliff–all of whom the ALJ deemed to be credible witnesses–the ALJ concluded that the statements were not made with actual malice. The Board, however, found otherwise. It based its conclusion almost exclusively on two portions of Jolliff's testimony. First, the Board assigned significant weight to the fact that Jolliff conceded that he personally had never been asked by the management to fix the logbooks. Second, it relied on Jolliff's statement that he thought that management should be disciplined for losing business. In holding that the Board's decision was not supported by substantial evidence, we find four facts persuasive: (1) The Board was removed from the witnesses and seemingly gave no weight to the ALJ's assessment of credibility; (2) The Board conflated "falsity" with "knowledge of falsity"; (3) Jolliff's testimony might have been relevant, but it was not as conclusive as the Board's decision suggests; and (4) the Board misinterpreted Jolliff's statements regarding the discipline of management.

First, the Board did not have the ALJ's benefit of observing the witnesses' demeanors. "We will not normally disturb the credibility assessments of the Board or the ALJ, who has observed the demeanor of the witnesses." *NLRB v. Cement Transport, Inc.*, 490 F.2d 1024, 1029 n.5 (6th Cir. 1974). In this case, the Board and this court are equally removed from the evidentiary hearing. The ALJ, who credited the testimony of the employees, was the only fact-finder with the benefit of direct observation. Thus, his determination of the matter is persuasive.

Second, the Board seemed to base its holding of actual malice on its underlying finding of fact that the statement was false. That is, it concluded that because the statement was false, the statement was made with knowledge of its falsity. This is an unwarranted inference. There is a "significant difference between proof of actual malice and mere proof of falsity." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984). "The burden of proving 'actual malice' requires the [party asserting actual malice] to demonstrate with clear and convincing evidence that the [accused party] *realized* that his statement was false or that he *subjectively entertained serious doubt* as to the truth of his statement." *Id* at 511, n.30 (emphasis added). Certainly, it is warranted to infer knowledge of falsity when a statement is so obviously false that any rational person making it would have to know that it is false. But that is not the case at hand. Indeed, the company found the charge of logbook- fixing credible enough to investigate whether it was true or false. Thus, the statement is not so obviously false that a rational person would necessarily conclude that Young knew of its falsity.

Third, in determining that the logbooks statement was made with actual malice, the Board focused almost exclusively on the testimony of Jolliff and not of Young, the party who actually made the statement. Jolliff's knowledge of whether the statement was true or false may be relevant to a finding of actual malice, but it is not conclusive. The statement alleged that "*some* drivers were" being asked by "dispatch and management" to fix the logbooks. Even if Jolliff was never personally asked to fix the logbooks, there might still have been good reason to believe that other employees had

been asked to fix the logbooks. Moreover, the record is silent as to whether Young formulated the logbooks statement on the basis of his own knowledge, from information gleaned from Jolliff, or from the statements of other employees. Indeed, the Board ignored the fact that Young had also discussed the issue of logbooks with Mr. Cox and that the statement about the logbooks might have originated with Young's personal experience and not Jolliff's or Daniels's.[4]

Even assuming that Jolliff was the sole source of information, his admissions do not prove that Young made the statement with actual malice. Jolliff and Daniels argue in their briefs that "the discrepancy between Mr. Young's statements in the letter and Mr. Jolliff's testimony [the difference between asserting that drivers felt pressure to alter the logbooks and asserting that drivers were actually asked to alter the logbooks] was something lost in translation by Mr. Young." Br. of Pet'rs 17. This argument is supported by the fact that neither Young nor Jolliff are particularly articulate or eloquent speakers. While lawyers are trained to parse carefully arguments and to pay close attention to the meaning of individual words, not everyone is so careful in crafting specific language and ordering ideas. As Justice Sutherland noted, "[e]ven the intelligent and educated layman has small and sometimes no skill in the science of law." *Powell v. Alabama*, 287 U.S. 45, 69 (1932). Similarly, we would be hard-pressed to assume that such a layman has the lawyer's love of precision in language. The record sheds no light as to the specific form or content of the comments Jolliff made to Young. But even if we assume that those comments were Young's sole basis for including the logbooks statement in the letter, it is not unreasonable to believe that Jolliff was careless or at least inartful in his construction of his complaint and that Young was equally careless or inartful in his retelling of the complaint. Given these facts, it was unwarranted for the board to infer that Young had knowledge of the statement's falsity solely from the fact that Jolliff conceded he had not personally been asked to fix the logbooks. *Street v. National Broadcasting Co.*, 645 F.2d 1227, 1236-37 (6th Cir. 1981) ("When the truth is uncertain and seems undiscoverable through further investigation, reliance on other sources is not unreasonable."); *cf. Orr v. Argus-Press Co.*, 586 F.2d 1108, 1113 (6th Cir. 1978) ("Courts must be cautious about letting libel cases go to the jury under the malice standard where there is no proof that the reporter or his newspaper knew or suspected that the statements in his article were false.").

The testimony reveals that the letter was a hodge-podge of statements from various parties. Jolliff admitted to providing input to the letter, and he also admitted that he complained to management about the pressure placed on the drivers when the company shortened by fifteen minutes the time allotted for completing certain runs. The record is silent as to whether Jolliff specifically included this complaint in his "input" and as to whether other parties might have passed on similar grievances regarding logbooks. Indeed, the record is silent as to what Jolliff, Daniels, and the other eighty to ninety workers specifically contributed. Young testified that he "told [the workers] to take a list of their grievances and just give them to me on a paper" and that he "picked from" the collected grievances and "put the letter together." The "ideas" were not all Young's own, but Young was the sole author. He crafted the letter using his own language and that letter was not reviewed by the contributors for accuracy. Regardless of whether Young's action can be imputed to the other parties, because Young made the statement, to find actual malice one would have to find that *Young* knew or should have known that the statement was false. This determination turns on how Young received the information and how he interpreted it.

Fourth, we note that the Board based its finding of actual malice, in part, on a bizarre reading of a statement made by Jolliff that he thought management should be disciplined:

---

[4]Young testified: "I'd often talked to [Mr. Cox] about log books, and how we should keep log books up and they should be – people be straight on them, and not fixing the log books to run extra runs."

Jolliff's earlier statement during a safety meeting that management should be "disciplined" suggests that the employees intended to effectuate their desire to "discipline" management by disseminating a damaging and false accusation to a vital customer, one likely to be sensitive to allegations of willful disregard of transportation regulations by its carrier.

*TNT Logistics North America, Inc.*, 347 NLRB No. 55, slip op. 2.

This interpretation of Jolliff's testimony runs contrary to the most reasonable interpretation of Jolliff's statement given his more detailed recollection of the conversation on cross-examination:

Q:  What did the dialogue consist of [at the safety meeting]?

A:  I was asking why – uh, you know, if we're going to get a bunch of new routes, if they're going to bid on them, and why isn't management responsible for the loss of business, you know.  And that basically that was it.

Q:  Did you testify earlier that you stated to Mr. Wheeler that management should be disciplined for *loss of business*.

A:  Yes, I – they had disciplined former contract manager before this.  And I asked them why, you know, why wasn't this done.

Q:  What former contract manager had been disciplined for loss of business?

A.  Uh – Bob Pitluck was the very first one.  He was there before Bob Wheeler, and he got disciplined for – uh, loss of – uh, well, I guess bad – bad bidding or whatever they call it.

Q.  Do you have any evidence to support that beyond your own testimony?

A.  Just that's what I've heard.

(emphasis added).

Given this context, Jolliff's statement that "management should be disciplined" clearly should be interpreted to mean "management should be disciplined by corporate" and not "management should be disciplined by unsanctioned action on the part of the employees."  This more reasonable interpretation does not, of course, provide any evidence that "the employees intended to effectuate their desire to 'discipline' management by disseminating a damaging and false accusation to a vital customer."

IV

Ultimately, the Board's finding of actual malice was not supported by substantial evidence in the record.  There was little or no direct evidence on whether Young knew that the statement was false. Rather, the Board reached its finding of actual malice by supplementing the thin record with unwarranted inferences and misinterpretations of testimony. We do not overturn the Board's decision lightly.  Strong deference must be given to decisions of the Board, lest this court overstep the bounds of its authority.  Nevertheless, we cannot and should not affirm the Board when its decision is based on essential factual findings that are not supported by substantial evidence in the record as a whole. We therefore **GRANT** Jolliff's and Daniels's petition for review and **REMAND** for proceedings consistent with this opinion.