**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0303n.06
Filed: May 29, 2008

**No. 06-2236**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

TROY OGLE,                                    )
                                              )
    Plaintiff-Appellant                    )
                                              )
v.                                            )    ON APPEAL FROM THE
                                              )    UNITED STATES DISTRICT
RICK HOCKER,                                  )    COURT FOR THE EASTERN
                                              )    DISTRICT OF MICHIGAN,
    Defendant-Appellee                     )    SOUTHERN DIVISION

Before: COLE and COOK, Circuit Judges; and MILLS, District Judge.[*]

MILLS, District Judge.

Troy Ogle brought defamation and intentional infliction of emotional distress claims against Rick Hocker based on statements he made concerning Ogle's behavior during a trip abroad.

The trial court granted Hocker's motion for summary judgment and Ogle appealed.

---

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

We reverse and remand for further proceedings.

## I. BACKGROUND

### A. Factual History

Plaintiff Troy Ogle ("Ogle") is a former international evangelist and ordained bishop who ministered in the Church of God ("COG") for over two decades. Defendant Rick Hocker ("Hocker"), also a COG bishop, works as a senior pastor at Virginia Beach COG.

In 1999, Hocker attended a prayer conference in Virginia where he first met Ogle. Both men met again at camp meetings in the summer of 1999 and 2000. At these two events, Hocker worked as the service coordinator and chairman of the music committee while Ogle appeared as a guest speaker. Ogle's preaching impressed Hocker and, following the last of these meetings, he accepted an invitation to accompany Ogle on a ten day ministry trip to Belgium.

On June 27, 2001, Hocker and Ogle flew to Belgium. The bishops spent most of the flight talking. At first the conversation was "prayerful" towards Belgium, but the topic soon turned to intimacy with God and from there to "intimacy between brothers, as well, between people." Ogle made several statements that Hocker later thought "strange," but he did not tell Ogle that the conversation offended him.

Once in Belgium, Ogle and Hocker went to their hotel room. Ogle approached

2

Hocker and, stating "In the love of Christ my brother," he kissed Hocker on the lips. The kiss was with a closed mouth and did not last long. Hocker also claims, though Ogle denies this, that Ogle appeared nude in the bathroom doorway with a partially erect penis. After these events, Ogle invited Hocker to join him for a prayer on the floor of their room. During this prayer, Ogle engaged in some sort of contact with Hocker. Hocker describes the contact as attempting to pull him into a sexual position, whereas Ogle claims that he was symbolically holding Hocker in his arms. Several hours later, Hocker informed Ogle that he was returning home. Hocker reassured Ogle that his decision to return was not a result of his actions. The next day, Hocker flew back to the United States.

On August 1, 2001, Hocker wrote a letter to his presiding bishop in the COG concerning Ogle's behavior.[1] Hocker asked that his allegations be kept confidential. In spite of this request, Hocker, though not mentioning Ogle by name, incorporated the incident into his August 5, 2001 sermons. At the 8:30 a.m. service, Hocker stated:

> And as I get on the plane, he begins to talk to me and I begin to realize that his doctrine is corrupt . . . . And when I get there [Belgium], he begins to manifest issues of homosexuality. He wants me to be his really good spiritual friend, quote unquote. . . . I see how easily the church can be tricked . . . . Now you listen to this - - we must protect ourselves as the church of the living God. We must protect from heresies and false doctrines and false prophets who would lead the very

---

[1]Ogle does not claim that this letter was defamatory.

3

elect away.

Returning to this theme in his 11:00 a.m. service, Hocker repeated:

> And I began to perceive that his doctrine was corrupt. . . . [H]e also
> wanted me to become his very good friend . . . . And I'm waiting on him
> to come back now from Belgium to face me, because I plan to face him
> in a counsel of ordained bishops and declare the man to be a heretic. . .
> . Because the enemy tried to take prophesy and the word of God and
> mesmerize me and take me out.

Finally, at the 6:00 p.m. service, Hocker declared: "God set me up. Put me on a plane set me next to a false prophet. . . . I want [sic] go into all of it, but man, I'll tell you, if ever I was in the wilderness looking at the devil face to face I was." In addition to making these statements during his sermons, Hocker repeated many of the allegations against Ogle to a number of individuals on at least seventeen occasions.

Since Hocker's initial letter constituted a formal charge in the COG, a committee was convened. An investigation ensued, eventually resulting in the suspension of Ogle's COG license for "unbecoming ministerial conduct." Although the Michigan COG State Council later approved Ogle's reinstatement, the International Executive Council halted the reinstatement process.

### B.    Procedural History

Ogle first brought an action against the COG and several individuals affiliated with it, including Hocker. In that suit, Ogle attacked various aspects of the COG's

4

administrative process and the actions of COG affiliates during that process. Although Ogle brought an intentional infliction of emotional distress claim against Hocker, he refrained from pursuing a defamation action. No mention was made of Hocker's sermon statements or his comments to others outside the church. The district court found that it lacked jurisdiction over the case because of the First Amendment's ecclesiastical abstention doctrine, *Ogle v. Church of God*, No. 1:03-cv-203 (E.D. Tenn. Sept. 9, 2004), and the appellate court affirmed, *Ogle v. Church of God*, 153 Fed. Appx. 371 (6th Cir. 2005).

While the action against the COG was proceeding, Ogle filed the current suit against Hocker based on theories of defamation and intentional infliction of emotional distress ("IIED") arising out of Hocker's statements to his congregation and others. Refusing to apply the ecclesiastical abstention doctrine, the district court nevertheless granted Hocker's motion for summary judgment on the defamation claim after determining that the statements were opinions protected under the First Amendment. *Ogle v. Hocker*, 2005 WL 1349111 (E.D. Mich. March 11, 2005). Ogle appealed the grant of summary judgment, but we dismissed the appeal, *sua sponte,* on jurisdictional grounds because the trial court had not ruled on the IIED claim. *Ogle v. Hocker*, 179 Fed. Appx. 314, 314-15 (6th Cir. 2006).

On remand, Hocker filed a new motion for summary judgment. Holding that

the IIED claim was merely derivative of the defamation claim, the trial court again granted summary judgment. *Ogle v. Hocker,* No. 02-73200 (E.D. Mich. Aug. 25, 2006). Ogle now appeals the grant of summary judgment on both the defamation and IIED claims.

## II.  STANDARD OF REVIEW

We review *de novo* grants of summary judgment under Federal Rule of Civil Procedure 56, *Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 274 (6th Cir. 2003)), and analyze summary judgment rulings using the standards employed by the district court, *Qualicare-Walsh, Inc. v. Ward*, 947 F.2d 823, 825 (6th Cir. 1991).  Therefore, the evidence and all reasonable inferences from it are construed in the light most favorable to Ogle.  *Doe v. Michigan Dep't. of State Police*, 490 F.3d 491, 497 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

## III. ANALYSIS

### A.    Church Autonomy Doctrine / Ecclesiastical Abstention

Before venturing into the merits, we must determine whether secular court

review of Ogle's claims complies with the dictates of the First Amendment.[2]  The

First Amendment provides that "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof."  U.S. Const.

amend I.  This clause applies to the judiciary as well as the legislature, *Kreshik v. St.*

*Nicholas Cathedral*, 363 U.S. 190, 191, 80 S. Ct. 1037, 4 L. Ed. 2d 1140 (1960), and

limits the power of the courts to hear suits "whenever the questions of discipline, or

of faith, or ecclesiastical rule, custom, or law have been decided by . . . church

judicatories . . . ."  *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666

(1871); *see also Serbian E. Orthodox Diocese for U.S. of Am. and Can.*, 426 U.S.

696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976).  Courts have variously termed this

restraint as the church autonomy doctrine or ecclesiastical abstention.

Hocker points to a particular branch of the church autonomy doctrine that

prohibits courts from reviewing the decisions of an ecclesiastical body relating to the

employment of a minister.  *See, e.g., Lewis v. Seventh Day Adventists Lake Region*

---

[2]Although not raised here, Hocker previously argued for the application of res judicata based on Ogle's prior suit against the COG.  While the Court may raise res judicata issues *sua sponte*, *see Hutcherson v. Lauderdale County, Tenn.*, 326 F.3d 747, 757 (6th Cir. 2003) (citing *Arizona v. California*, 530 U.S. 392, 412, 120 S. Ct. 2304, 147 L. Ed. 2d 374 (2000)), we note that application of the doctrine in this case would be inappropriate since Ogle's allegedly defamatory statements (made outside of the administrative proceedings) constitute separate and distinct injuries*, see Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 582 (6th Cir. 1994) (refusing to apply res judicata where "[t]he two claims were not simply two separate grounds for recovery, but instead stemmed from entirely separate and discrete events and wrongful acts by the [defendant].").

*Conference*, 978 F.2d 940, 942 (6th Cir. 1992). Indeed, Ogle's first suit against the COG floundered on this very rule. In this case, however, Hocker's statements were unrelated to any pending employment decision, and thus these cases are inapposite.[3]

Hocker also invokes broader aspects of the church autonomy doctrine. In particular, he argues that secular court review of Ogle's claims would impermissibly impinge upon internal ecclesiastical matters since the case involves a dispute between COG ministers regarding a sermon. Whether a secular court may hear a tort suit despite the church autonomy doctrine turns on the availability of secular standards and the ability of a court to resolve the controversy without reference to religious doctrine.[4] *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004); *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 336-38 (5th Cir. 1998). In

---

[3]To the extent Ogle seeks damages based on the COG's decision to suspend him or the loss of his reputation within the COG, Ogle's claims might be barred by this rule. An inquiry into these damages might require consideration of whether the defamation caused the COG's employment actions, thereby inviting an exploration of the church's motives. A secular court cannot take this step.

[4]It should be noted that this is not a clergy malpractice claim, but rather an intentional tort suit. Most courts have agreed that clergy malpractice claims, whether labeled as such or as negligence suits, are improper, because they would force the courts to fashion a religiously based standard of care for church officials. *See, e.g., Sanders v. Casa View Baptist Church*, 134 F.3d 331, 336-37 (5th Cir. 1998). These concerns disappear, however, where a pastor or other religious figure is offering secular services, since secular standards can be applied. *Id.* at 337. Although this case involves allegations of intentional torts, the same underlying concern (i.e., avoiding interference with ecclesiastical affairs) applies in both contexts.

*Elvig*, for example, an ordained minister was allowed to pursue her sexual harassment and hostile work environment claims against her church. *Elvig*, 375 F.3d at 959. The court, while rejecting any church liability for employment actions, held that the plaintiff's claims could be resolved by a "purely secular inquiry." *Id.* Even so, the court warned that if the church claimed that the sexual harassment was doctrinal, jurisdiction would be foreclosed by the First Amendment. *Id.* However, since the church in that case had not claimed doctrinal status for the alleged actions, the court allowed the case to proceed. *Id.*

Like the inquiry into a hostile work environment in *Elvig*, the laws of defamation and intentional infliction of emotional distress (when based on defamation) can be applied based solely on secular rules. *See Dausch v. Rykse*, 52 F.3d 1425, 1433 (7th Cir. 1994) ("Tort claims for behavior by a cleric that do[] not require the examination of religious doctrine are cognizable."). Thus, the relevant question before us is whether the court would interfere with any matters of church doctrine or practice by ruling on this case.

Hocker's claim for protection under the church autonomy doctrine derives mainly from context: the dispute was between two COG bishops and the allegedly defamatory statements occurred, in part, during sermons. While we are solicitous of protecting religious services from interference, we do not believe it proper to simply

9

label a sermon as "ecclesiastical" and bar suit. Rather, we ask whether the suit will require us to delve into protected matters of church doctrine, policy, and practice. *See Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 98 F.3d 78, 95 (3d Cir. 1996) ("[T]he extent to which a court may permissibly inquire into [ecclesiastical] disputes . . . turns on the specific elements of the inquiry itself and the degree to which it might trench upon doctrinally sensitive matters, rather than on conclusory labeling of the whole dispute as either 'secular' or 'ecclesiastical.'").

Looking to the specifics of this suit, we are not convinced that the court will be forced to inquire into doctrinal issues. First, although Hocker's statements were part of a sermon, he also repeated the allegations, along with others, on numerous occasions after the sermon, thus taking the bulk of his comments outside of the religious practice context. Further, as the district court noted, the sermon statements themselves were not related to employment or polity issues, but were given as a personal life example of deception. Second, neither party has pointed to any doctrinal issues that will be involved. We are not asked to determine whether Ogle's actions complied with church law, whether Hocker's religious condemnation of Ogle comports with the religious tenants of the COG, or whether Hocker's statements supported his doctrinal point. Nor could Hocker's statements be construed to involve

10

pastor-parishioner discipline, since Ogle did not belong to or attend Hocker's Virginia Beach church. *See Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875, 878 (9th Cir. 1987) (refusing to apply doctrine of ecclesiastical abstention to "shunning" rule challenge because plaintiff did not challenge the rules as contrary to church law or seek relief for wrongful "shunning," but instead sought "relief for the harms suffered as a result of conduct engaged in by the Jehovah's Witnesses that is presumably consistent with the governing law of the Church"). Most importantly, however, Hocker does not claim that defamation is a practice of his church or is otherwise rooted in religious belief. Were he to do so, our power to adjudicate his claims would be doubtful. *See Sanders*, 134 F.3d at 337-38. The only issue is whether Hocker's purported factual statements, made both during a sermon and in multiple other contexts, were falsehoods that harmed Ogle. Thus, despite our compunction about reviewing statements made by a pastor, some of which were from the pulpit, we believe that civil court jurisdiction is justified in these limited circumstances because the disputed issues can be resolved through application of secular standards without any impingement upon church doctrine or practice.

## B.    State Law Claim - Defamation

Having determined that the First Amendment's religion clause does not prevent adjudication of this case, we turn to Ogle's claims of defamation and IIED. Relying

11

on the First Amendment's free speech clause, Hocker contends that summary judgment was properly granted because (1) his statements were not provably false, (2) Ogle was required to show actual malice, and (3) Ogle failed to show that Hocker's statements were false. We address these contentions in turn.

### 1. Capable of Carrying a Defamatory Meaning

The Supreme Court has refused to construe the First Amendment to provide an opinion exception to defamation law, reasoning that sufficient protection already exists for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Jolliff v. N.L.R.B.*, 513 F.3d 600, 610 (6th Cir. 2008) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)). Nevertheless, "'a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection. . . .'" *Id.* (quoting *Milkovich,* 497 U.S. at 20). In other words, statements of pure opinion, hyperbole, or rhetorical exaggeration will receive First Amendment protection, but statements deemed capable of carrying a defamatory meaning will not. *Id.* Whether a statement is capable of carrying a defamatory meaning is a question for the court. *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Falls v. Sporting News Publ'g Co.*, 834 F.2d 611, 615-16 (6th Cir. 1987)). The court does not decide whether a statement was actually defamatory, but

12

only whether a reasonable fact-finder could interpret it as containing false assertions of fact. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991).

While the Supreme Court provided examples of how to determine whether protected opinion is at issue, it did not set out an explicit test. In *Jolliff*, we canvassed the tests and approaches of other circuits and created a framework for ascertaining whether a defamatory meaning can be gleaned from the allegedly defamatory statement. *Jolliff*, 513 F.3d at 610-612. Under this approach, the court parses the language of the statement under a multi-factor test:

> (1) The common usage or meaning of the allegedly defamatory words themselves, whether they are commonly understood to be loose, figurative, or hyperbolic words;
>
> (2) The degree to which the statements are verifiable, whether the statement is objectively capable of proof or disproof;
>
> (3) The immediate context in which the statement occurs; and
>
> (4) The broader social context into which the statement fits.

*Id.* at 611-12.

Applying these factors to the case before us, we conclude that Hocker's statements were not protected.[5] First, while many of Ogle's sermon statements were

---

[5]Ogle makes two assertions relating to the applicability of *Milkovich*. First, he claims that this case involves a private figure and a matter of private concern and that *Milkovich* does not apply in such contexts. *But see* Restatement (Second) of Torts § 566 cmt. c, at 173 (1977) ("Although it is . . . possible that [the Supreme Court will treat] private communications on

(continued...)

13

either figurative or hyperbolic (for example, the claim that Ogle was a "false prophet"), the common meaning of other phrases suggests, as a literal fact, that Ogle wished to engage in homosexual behavior (for example, "[h]e also wanted me to become his very good friend. . . ."). *See Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053-54 (9th Cir. 1990) (finding defamatory factual assessment in a TV segment otherwise was filled with hyperbole and humor). Second, many of the statements are verifiable. While that verification may depend on whose story a listener believes, most of the assertions are tied to underlying factual assertions. For example, a phrase like "manifested issues of homosexuality," which cannot easily be reduced to a clear meaning, nevertheless carries implicit factual assertions (i.e., that Ogle wished to engage in homosexual behavior).[6] Like the allegations of perjury in *Milkovich*, these assertions may be disputed, but they are verifiable. *See Milkovich*, 497 U.S. at 21-22, 110 S. Ct. 2695, 111 L. Ed. 2d 1. Third, the context of the statement cuts both ways. Hocker's sermon was intended to excite and outrage his congregation. Thus, some

_____

[5](...continued)
private matters . . . differently, the logic of the constitutional principle would appear to apply to all expressions of [pure] opinion. . . ."). Second, he argues that in the private figure/matter of private concern context, Michigan law requires the defendant to show that a statement is "not provably false." Since we conclude that *Milkovich* provides no protection (and because neither party briefed the issue of whether a matter of public concern is at issue), we decline to address these additional points.

[6]Some statements, like Hocker's declaration that Ogle was a "false prophet" cannot be verified. Nevertheless, the underlying factual assertion that Ogle attempted to engage in homosexual behavior can be.

14

of his statements might be considered as rhetorical flourishes. *See Jolliff*, 513 F.3d at 613 (distinguishing letter to management from "leaflets, pamphlets, or organizing slogans meant to excite workers or rally their support . . ."). On the other hand, Hocker also passed his declarations on to others in a number of conversations, which suggests he intended his statements to be accepted as literally true. In both contexts, however, Hocker's statements invited his audience to believe that Ogle made homosexual advances. As such, this factor suggests an underlying defamatory meaning. The fourth factor, the broader social context, mirrors the third factor. The sermon statements were more likely to be rhetorical and exaggerated, whereas the one-on-one statements would likely convey the message that Hocker's version of events was literally true. *See id* (distinguishing between private communications, which are more likely to be taken as literally true, from public communications, which are more likely to be rhetorical). Weighing these factors together, we find that a reasonable trier of fact could attribute a defamatory meaning to Hocker's statements. Therefore, the district court erred in granting summary judgment based on *Milkovich*.

### 2. Actual Malice

We next turn to Hocker's alternative argument that Ogle's claim must fail because he has failed to demonstrate actual malice. Whether actual malice must be

proven, however, turns on whether Ogle is a public or private figure, a classification that the parties vigorously dispute.[7] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

Public figures are those who have "assumed roles of especial prominence in the affairs of society." *Id*. at 345. However, "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Id.* at 352. The evidence relating to whether Ogle is a public figure is sparse, deriving mainly from Ogle's own pleading statement that he is an "international evangelist" who has attained "international fame and reputation throughout the nation, as well as other countries, with respect to his ministry." (J.A. 10.) Hocker argues these statements establish Ogle as a "self-proclaimed public figure," but this position must be rejected. Even assuming that proclaiming oneself a public figure were sufficient, Ogle's statements admit fame only "with respect to his ministry." Therefore, he could

---

[7]Hocker also claims that various qualified privileges protect his statements. The privileges he relies on, however, require him to show a duty to disclose and disclosure to proper parties only. *See, e.g., Bufalino v. Maxon Bros., Inc.*, 368 Mich. 140, 153, 117 N.W.2d 150 (1962) (describing elements of duty privilege as "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only"). Even assuming Hocker's congregation may have been a proper receiving party, the record is unclear about whether Hocker also disclosed the information to persons outside the church. As such, summary judgment would be improper on this ground.

not have conceded that he was a public figure for all purposes.[8]

Although Ogle has not attained the status of public figure, Hocker contends that he is at least a limited purpose public figure. Private persons can become public figures by "'thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" *Wolston v. Reader's Digest Ass'n., Inc.*, 443 U.S. 157, 164, 99 S. Ct. 2701, 61 L. Ed. 2d 450 (1979) (quoting *Gertz*, 418 U.S. at 345, 94 S. Ct. 2997, 41 L. Ed. 2d 789). Mere association or involvement in a controversy is not necessarily enough; instead the court analyzes the "'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" *Id.* at 167 (quoting *Gertz*, 418 U.S. at 345, 94 S. Ct. 2997, 41 L. Ed. 2d 789).

Under these standards, Ogle fails to qualify as a limited-purpose public figure. Hocker's allegedly defamatory statements concerned Ogle's actions in a hotel room in Belgium. Even if true, these actions plainly did not thrust Ogle to the forefront of any public controversy. Nor is that conclusion disturbed by the public stir that later surrounded Hocker's accusations. *See Hutchinson v. Proxmire*, 443 U.S. 111 (1979). Therefore, since nothing shows that Ogle thrust himself into the vortex of a public

---

[8]Indeed, Ogle can hardly be said to possess pervasive fame when Hocker, himself a bishop in the COG church, had not heard of him prior to their first meeting.

17

issue, Ogle will be treated as a private figure plaintiff. As such, actual malice need not be proved, and Hocker's alternative grounds for affirming the trial court must fail.

### 3. Proof of "Falsity"

Finally, the parties dispute whether a *prima facie* case for defamation has been established. Under Michigan law, a defamation claim requires "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication" (defamation *per quod*). *Mitan v. Campbell,* 474 Mich. 21, 24, 706 N.W.2d 420 (2005) (citations omitted). The parties dispute whether Ogle has shown falsity.

"Where the alleged defamation concerns both a private figure and a matter of private concern, the burden of proving that the statement was not false rests with the defendant. However, where the statements are of public concern, the private-figure plaintiff bears the burden of proving falsity." *J&J Constr. Co. v. Bricklayers & Allied Craftsmen, Local 1*, 468 Mich. 722, 732 n.11, 664 N.W.2d 728 (2003) (citations omitted). The district court did not reach this issue. And although both parties note the importance of the public/private concern, they utterly fail to discuss the issue or cite any supporting case law. Given this serious failing and the importance of the

issue to the case, we remand to the district court to permit it to consider the question in the first instance. *See Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 134 (1st Cir. 1997) (refusing to resolve public concern issues at the appellate level).

### C. State Law Claim - Intentional Infliction of Emotional Distress under Michigan Law

Finally, we turn to Ogle's IIED claim. The trial court premised its grant of summary judgment on this claim solely on the invalidity of Ogle's defamation claim. As discussed above, this was erroneous. Thus, to the extent that the trial court determines that Ogle has set forth a *prima facie* defamation claim, the IIED claim should also be reinstated. Hocker, however, argues that even if the defamation action survives, the IIED claim should still be dismissed because his conduct was not "extreme and outrageous." We disagree.

Although the Michigan Supreme Court has not recognized IIED claims, this Court has assumed that it will do so. *Andrews v. Prudential Sec., Inc.*, 160 F.3d 304, 309 (6th Cir. 1998). The elements of such a claim consist of "(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Id.* "The threshold for showing extreme and outrageous conduct is high." *VanVorous v. Burmeister*, 262 Mich. App. 467, 481, 687 N.W.2d 132 (2004). Liability attaches only where the conduct is "so outrageous in character, and so

19

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 603, 374 N.W.2d 905 (1985)). "The test is whether the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'" *Graham v. Ford*, 237 Mich. App. 670, 674-75, 604 N.W.2d 713 (1999) (quoting *Roberts*, 422 Mich. at 603, 374 N.W.2d 905) (internal quotations omitted).

Construing all inferences in Ogle's favor, a reasonable jury could potentially find "extreme and outrageous conduct." According to Ogle's version of events, Hocker deliberately spread false rumors of Ogle's homosexual inclinations on multiple occasions to large audiences. A jury could find that this conduct extends well beyond "mere insults, indignities, threats, annoyances, petty oppressions, [and] other trivialities." *Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335, 342, 497 N.W.2d 585 (1993) (citing *Roberts*, 422 Mich. at 603, 374 N.W.2d 905). As such, we cannot say that Ogle's claim falls short as a matter of law. *See id.* at 342-43 (circulation of cartoon depicting plaintiff in a sexually compromising position could be basis for IIED claim).

### IV. CONCLUSION

For the reasons stated above, this Court REVERSES the trial court's grant of

20

summary judgment and REMANDS for further proceedings.