NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0532n.06

No. 20-4141

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Nov 22, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WALTRINA MIDDLETON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| UNITED CHURCH OF CHRIST BOARD, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: BOGGS, MOORE, and LARSEN, Circuit Judges

BOGGS, J., delivered the opinion of the court in which LARSEN, J., joined. MOORE, J. (pp. 10–14), delivered a separate opinion concurring in the judgment.

BOGGS, Circuit Judge. The First Amendment's ministerial exception "ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'— is the church's alone." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194–95 (2012) (quoting *Kedroff v. Saint Nicholas Cathedral Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)). Rev. Waltrina Middleton appeals the dismissal of her Title VII discrimination claim against her former employers of the United Church of Christ. Her claim is not based on her eventual firing or any other tangible employment action[1] taken against her, but

---

[1] A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision

on the alleged anti-Black hostile work environment she endured when employed. The questions before this court are (1) if the ministerial exception bars some or all of Middleton's allegations from consideration and (2) if she has failed to allege a plausible claim for hostile-work-environment discrimination.

## I. JURISDICTION AND STANDARD OF REVIEW

The jurisdiction of the district court was invoked pursuant to 28 U.S.C. § 1331. Middleton alleges a cause of action under the Civil Rights Act of 1964, 42 U.S.C. § 2000. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's dismissal of a Title VII claim de novo. *See, e.g.*, *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012).

## II. FACTS AND PROCEDURE

Middleton is an ordained minister of the United Church of Christ. In 2010, she was hired by the United Church of Christ's governing Board and Local Church Ministries to organize and plan national youth events. She was fired six years later. Middleton alleges the following as examples of a racist hostile work environment:

- In 2010, a UCC "constituent" told Middleton, "I thought you only got the job because you are young, black and from Trinity [United Church of Christ in Chicago]." Middleton reported this comment to her supervisor, but no action was taken.

- In 2013, Middleton expressed concern to her church human-resources director that the only candidates being considered to replace Middleton's supervisor were of "one cultural and gender and demographic group." Middleton's concerns were ignored and Ivy Beckwith, a white woman, was hired as her new supervisor.

- In February 2014, Beckwith told Middleton that she "understood 'exactly what [Middleton's] problem is,'" which was that Middleton is "a sassy, young, African American woman."

- In March 2014, Middleton complained to human resources that she had been subject to a hostile work environment by a UCC managerial employee because that

causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

employee "refus[ed] to communicate with" Middleton and spread "false information about a job assignment that [Middleton] had completed in the manner that [the managerial employee] requested."

- Less than a week later, Middleton met with Beckwith "and articulated her concerns about how personal biases and stereotypes among [UCC] managers 'create perceptions that are racist, sexist and discriminatory.'" Beckwith responded by telling Middleton that she did not like that Middleton had complained to human resources and told Middleton to get along with people holding racist, sexist, and discriminatory views because of the money they give to the UCC.

- On August 6, 2015, Beckwith "engaged in rude, unprofessional and insensitive conduct toward [Middleton] during a meeting regarding how [Middleton] had conducted herself at the 2015 General Synod." At the synod, Middleton had "lifted up social justice issues" related to "racism and sexual orientation" that "some groups were not comfortable with." When Middleton told Beckwith she wanted to go to human resources, Beckwith told her, "Go right ahead. You take everything else to HR."

- When Middleton contacted human resources requesting "urgent mediation" of her August 2015 conflict with Beckwith, mediation was not granted. The record is not clear if human resources ignored Middleton's request or made an affirmative decision not to grant mediation. Middleton also raised her concern with her Local Church Ministries executive officer but received no response.

- Around August 19, 2015, the UCC demoted Middleton. "Several [UCC leaders] lamented Dr. Middleton's demotion, calling it 'racist,' one more instance of 'the diminishing presence of black and brown people in leadership on the national level,' and 'an attempt to mute the voice of the one remaining black leadership voice.'" When the UCC hired a white woman as Middleton's replacement, a UCC minister expressed that "there appears to be a system defect [in the UCC] when it comes to African American staff persons" giving "evidence to the charge of institutional racism. This action appears to support that claim."

- On September 8, 2015, Middleton was demoted a second time to a temporary position scheduled to end in August 2016.

- In October 2015, the UCC abruptly ended the two-month sabbatical she had been granted after two weeks.

- In August 2016, Middleton "was denied advancement to the position of Team Leader for the Office of the Chief Administrative Officer" and the church hired a less-qualified white woman instead.

- In June 2016,[2] the UCC fired Middleton, months before her temporary position was set to end in August.

---

[2] The complaint does not explain how Middleton could have been denied a promotion in August 2016 after being fired in June 2016.

Middleton filed suit. To address the constitutional question, the district court relied on our unpublished opinion in *Ogle v. Hocker*, 279 F. App'x 391 (6th Cir. 2008), which held that a minister's defamation and intentional infliction of emotional distress claims were not barred from consideration by the First Amendment. The *Ogle* court reasoned that because the plaintiff minister's claims could "be resolved through application of secular standards without any impingement upon church doctrine or practice," dismissal was not appropriate. *Ogle*, 279 F. App'x at 396. Accordingly, the district court held that the ministerial exception did not bar Middleton's claims from consideration. The district court ruled in favor of the UCC and granted its motion to dismiss, holding that Middleton failed to "allege severe or pervasive conduct, [and as such,] her allegations do not support a plausible hostile work environment claim." The only claim on appeal is Middleton's hostile-work-environment claim.

### III. ANALYSIS

Title VII prohibits employers from discriminating against an employee because of her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To assert a cause of action under Title VII for a hostile work environment, a plaintiff must make direct or inferential allegations that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [her protected status], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).

A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (quoting *Harris*, 510 U.S. at 21).

Middleton argues that we should consider the church's tangible employment actions[3] even though they are not the basis of her hostile-work-environment claim because "[t]hese discriminatory acts . . . are important allegations to be considered in evaluating the claim of a hostile work environment." In other words, while Middleton acknowledges that the ministerial exception bars a direct challenge to these adverse tangible employment actions, she argues that they should be considered to show that her other treatment (the basis of her claim) was motivated by racism. But the unanimous consensus among circuit courts that have addressed this issue is that the ministerial exception bars any judicial consideration of a church's tangible employment actions taken against a minister in a discrimination claim, regardless of its underlying basis. *See, e.g.*, *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 969 (9th Cir. 2004) (stressing that "in both the sexual harassment and retaliation contexts, Elvig may not rely on protected ministerial decisions—the removal of certain duties, her suspension, her termination and the refusal to permit the circulation of her personal information form—as bases for the Defendants' liability under Title VII"); *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1246 (10th Cir. 2010). We join that consensus today. Otherwise, the church would be required to respond that its tangible employment actions were motivated not by discriminatory animus, but by nondiscriminatory reasons relating to Middleton's fitness and qualifications as a minister. To resolve the dispute, the court would then be required to conduct a pretext inquiry to determine the church's true motivation.

---

[3] Allegedly, (1) the church only considered white candidates for the role of Middleton's direct supervisor; (2) the human-resources director denied Middleton's mediation request; (3) Middleton was demoted and replaced by a white woman; (4) Middleton was demoted to a temporary position; (5) the church reduced Middleton's sabbatical; (6) Middleton was denied promotion, and the position was filled a less qualified white woman; and (7) Middleton was fired.

This would involve an examination of the church's reasons for determining the fitness and qualifications of its ministers—a determination necessarily informed by religious belief. This is precisely the kind of state inquiry into church employment decisions that the First Amendment forbids. *Elvig*, 375 F.3d at 961–62 (citing *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999)); *cf. Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985).

Therefore, in evaluating the merits of a minister's claim, we must disregard any allegations based on tangible employment actions at the outset. Accordingly, only the following of Middleton's allegations remain:

- In 2010, a UCC "constituent" told Middleton, "I thought you only got the job because you are young, black and from Trinity [United Church of Christ in Chicago]." Middleton reported this offensive comment to her supervisor, but no action was taken.

- In February 2014, Middleton's new supervisor, Ivy Beckwith, told her that she "understood 'exactly what [Middleton's] problem is,'" which was that Middleton is "a sassy, young, African American woman."

- In March 2014, Middleton complained to human resources that she had been subject to a hostile work environment by a UCC managerial employee who "refus[ed] to communicate with" Middleton and spread "false information about a job assignment that [Middleton] had completed in the manner that [the managerial employee] requested."

- Less than a week later, Middleton's met with Beckwith "and articulated her concerns about how personal biases and stereotypes among [UCC] managers 'create perceptions that are racist, sexist and discriminatory.'" Beckwith responded that she did not like that Middleton had complained to human resources and told Middleton to get along with persons holding racist, sexist, and discriminatory views because of the money they give to the UCC.

- On August 6, 2015, Beckwith "engaged in rude, unprofessional and insensitive conduct toward [Middleton] during a meeting regarding how [Middleton] had conducted herself at the 2015 General Synod." When Middleton told Beckwith she wanted to go to human resources, Beckwith told her, "Go right ahead. You take everything else to HR."

The circuits are split on whether the ministerial exception categorically bars courts from considering a minister's hostile-work-environment claims. *See, e.g.*, *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 973 (7th Cir. 2021) (en banc) (categorical bar); *Skrzypczak*, 611 F.3d at 1246 (categorical bar); *Elvig*, 375 F.3d at 965 (no categorical bar). But we need not reach that question here because the remaining allegations in and inferences arising from Middleton's complaint do not come close to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. As the Supreme Court has stressed, "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation marks and citations omitted).

Taking Middleton's remaining allegations together and as true, the UCC and her supervisor's actions were unprofessional and at times offensive but fall short of being sufficiently severe or pervasive for her to plausibly plead a hostile work environment under the standard set out in *Harris*. To be sure, there is a line between offensive and abusive conduct that is not always clear. But even after accepting her allegations as true and drawing all reasonable inferences in her favor, Middleton's complaint fails to state a claim on which relief can be granted.

The church constituent's comment that Middleton was hired because she is Black was offensive but not abusive[4] and did not occur again. That the church did not respond with corrective

---

[4] We use the term "abusive" as a shorthand for the *Harris* standard: "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21.

action to Middleton's complaint does not demonstrate an abusive environment, either. Although we accept that Beckwith's statement that Middleton is "a sassy, young, African American woman" was intended to be offensive, not all "offensive utterances" will "rise to the level required by the Supreme Court's definition of a hostile work environment," especially when the comments are isolated. *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008); *see, e.g.*, *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017); *Williams*, 643 F.3d at 513; *Clay v. United Parcel Serv., Inc.*, 501 F.3d 685, 707–08 (6th Cir. 2007). "To hold otherwise would risk changing Title VII into a code of workplace civility," an outcome that the Supreme Court and this court have rejected. *Grace*, 521 F.3d at 679 (quotation marks omitted); *see Faragher*, 524 U.S. at 788.

Middleton's allegation that a managerial employee refused to communicate with her and spread false information about Middleton's performance on a task is troubling, but Middleton alleges no facts for us to draw the reasonable inference that this mistreatment was motivated by Middleton's race. The Church's failure to address Middleton's complaint about alleged biases and stereotypes among the UCC managerial staff was less than laudatory but, again, not an example of severe, pervasive, or abusive harassment toward her. When the underlying offenses do not amount to abuse, management's failure to respond cannot be used to augment the claim and amount to a hostile environment.

Beckwith's comments that she did not like that Middleton went to human resources and telling Middleton to "get along" with donors with discriminatory views is offensive but not abusive, nor does Middleton allege that those donors subjected her to any abuse. Finally, Beckwith's rude behavior toward Middleton in a meeting as well as her sarcastic comment that Middleton took everything to human resources also do not amount to discriminatory intimidation, ridicule, or insult that created an abusive working environment. Although abusive people are

always awful, not all awful people are abusive. Some are rude, insensitive, ignorant, and incompetent, or are driven by more mundane faults rather than a desire to demean or subordinate another person or protected class because of that status.

Despite Middleton's argument to the contrary, the district court did not apply a summary-judgment standard but rather the correct standard under Rule 12(b)(6). Middleton may have been treated poorly by a poor manager and poor management, but she fails to plead facts sufficient to show that they subjected her to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter to the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21.

**AFFIRMED**.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** This case should be simple. Waltrina Middleton appealed the district court's decision to grant the United Church of Christ's (UCC) motion to dismiss. Middleton claims that she endured a hostile work environment in violation of Title VII while serving as a minister at the UCC. Because she did not allege sufficient facts in her complaint to make this claim plausible, Middleton loses. Case closed. The majority reaches this conclusion, but not before detouring through another issue: the applicability of the First Amendment's ministerial exception to Title VII claims brought by ministers against churches. Addressing this question is unnecessary. The district court should instead be affirmed for the straightforward reason that Middleton failed to state a claim upon which relief could be granted under Rule 12(b)(6).

Middleton's claim of a hostile work environment clearly fails under Rule 12(b)(6). Middleton's complaint describes five instances indicating that she suffered an anti-Black hostile work environment. In November 2010, a constituent told Middleton: "I thought you only got the job because you are young, black and from Trinity [United Church of Christ in Chicago]." R. 1 (Compl. ¶ 12) (Page ID #3) (alteration in original). In February 2014, a supervisor called Middleton "a sassy, young, African American woman." *Id.* ¶ 15 (Page ID #4). In March of that year, Middleton complained to the church's human-resources director that another employee refused to communicate and was spreading false information about Middleton's handling of a work assignment. *Id.* ¶ 16. Five days later, Middleton's supervisor told Middleton that she should not have expressed her concerns to human resources. *Id.* ¶ 17. Instead, the supervisor stated, Middleton "should work harder to get along with persons holding racist, sexist and discriminatory views because of the money they give to [the UCC]." *Id.* In August 2015, the same supervisor was "rude, unprofessional and insensitive" to Middleton. *Id.* ¶ 18.

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). An "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Courts regard the totality of the circumstances to determine whether a work environment is hostile. *See Harris*, 510 U.S. at 23. Relevant factors include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" as well as the "employee's psychological well-being." *Id.*

In light of the facts as alleged in the complaint, Middleton undoubtedly experienced offensive treatment at the UCC. But she has not sufficiently alleged that her workplace was objectively permeated with racist ridicule, insult, and intimidation. Under our caselaw, occasional offensive utterances do not constitute a hostile work environment. *Compare Williams v. Gen. Motors Corp.*, 187 F.3d 553, 558–59 (6th Cir. 1999) (concluding that a genuine issue of material fact existed about work environment's hostility when supervisor repeatedly inflicted sexual innuendo on employee; greeted employee with derogatory term; and stated "I'm sick and tired of these fucking women" among other acts within ten-month span), *with Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008) (concluding that plaintiff failed to state prima facie case of hostile work environment even though colleague referred to plaintiff as "dancing girl" or "call girl" and commented on plaintiff's appearance); *see also Burnett v. Tyco Corp.*, 203 F.3d 980, 983–85 (6th

Cir. 2000) (collecting cases that analyze repeated offensive comments). Given our established precedent, we must conclude that Middleton's hostile-work-environment claim simply fails to survive the motion to dismiss.

Considerations that transcend this case advise stopping at this juncture. We generally abstain from choosing a controlling standard when doing so would be unnecessary. *See, e.g.*, *United States v. Rios*, 823 F. App'x 398, 402 (6th Cir. 2020) (Boggs, J.) ("Because [choosing between abuse-of-discretion and plain-error standards] makes no difference to the outcome, we need not decide this issue."); *Bryant v. Wilkie*, 834 F. App'x 170, 173–74 (6th Cir. 2020) (Larsen, J.) (declining to pick between Rule 12(b)(6) and summary-judgment standards when plaintiff would fail both). Judicial restraint is particularly apt before wading into issues of constitutional law. *See Miami Univ. Associated Student Gov't v. Shriver*, 735 F.2d 201, 203 (6th Cir. 1984) ("It is a well-established principle that the federal courts should not decide a constitutional question if there is some other ground upon which to dispose of the case."). Given these principles, the fact that Middleton failed to state a plausible claim of a hostile work environment in her complaint should resolve the case.

Nevertheless, the majority presses onward and decides that the ministerial exception bars courts from examining tangible employment actions when evaluating a Title VII claim brought by a minister against a church. This is unwarranted. As the Supreme Court has explained, the ministerial exception "operates as an affirmative defense to an *otherwise cognizable claim*, not a jurisdictional bar." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012) (emphasis added); *see also Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 833 (6th Cir 2015) ("The ministerial exception is an affirmative defense . . . ."). With this in mind, we have previously approached Title VII claims that implicate the ministerial

exception by first determining whether the plaintiff has stated a viable claim before then turning to analyze the defendant's ministerial-exception defense. *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 580–81 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Again, Middleton failed to present an "otherwise cognizable claim" in her complaint. *Hosanna-Tabor*, 565 U.S. at 195 n.4. Again, case closed.

Nothing in this case requires saying more. The majority appears to believe that it must use the ministerial exception to sift through Middleton's allegations, separating those that may run afoul of the doctrine, such as her allegations that the UCC demoted and fired her, from those that do not, such as the five offensive instances she relies on for her claim of a hostile work environment. But Middleton conceded to the district court that any alleged tangible employment actions taken by the UCC were "separate[] and apart" from her claim of a hostile work environment and thus not part of that inquiry. R. 7 (Middleton's Mem. in Opp'n to UCC's Mot. to Dismiss at 1) (Page ID #48).

In fact, "conceded" may be too light a word. Middleton positively *stressed* that she did not want the district court to consider any alleged tangible employment actions in the context of her hostile-work-environment claim, stating that "Plaintiff's First Cause of Action alleges precisely this: that Defendants harassed her, not that Defendants took tangible employment actions (such as demotion or termination) against her." *Id*. at 7 (Page ID #54). If this was not clear enough, Middleton added that to the extent that she did identify tangible employment actions that led to lost wages and benefits, these damages would be "based on her breach of contract and promissory estoppel claims," not on her claim of a hostile work environment.[1] *Id*. at 7 n.1 (Page ID #54).

---

[1] Middleton does not appeal the dismissal of her claims of breach of contract and promissory estoppel.

Told by Middleton to set aside any allegations related to tangible employment actions when considering her hostile-work-environment claim, the district court obliged. *See Middleton v. United Church of Christ Bd.*, 483 F. Supp. 3d 489, 501–02 (N.D. Ohio 2020).

There is no need to winnow down Middleton's allegations further by applying the ministerial exception. Middleton has already done that work for us. That Middleton now references the adverse employment actions as context for her claim of a hostile work environment does not change this fact. Middleton Br. at 20. Rather, Middleton is just attempting to sidestep the consequences of her concession and have us consider allegations that she previously told the district court to ignore. The majority should not—and, in other cases, would not[2]—give credence to this about-face.

For these reasons, there is absolutely no need to explore the scope of the ministerial exception here, and in doing so the majority has simply engaged extensively in dicta. I concur only in the judgment.

---

[2] *See, e.g.*, *Bose v. Bea*, 947 F.3d 983, 992 (6th Cir. 2020) (Larsen, J.) (declining to address argument that plaintiff appeared to have "abandoned"); *Rudolph v. Lloyd*, 807 F. App'x 450, 458 (6th Cir. 2020) (Larsen, J.) ("We do not ordinarily entertain arguments not presented to the district court."); *Thompson v. Parker*, 867 F.3d 641, 652 (6th Cir. 2017) (Boggs, J.) ("The clear rule is that appellate courts do not consider issues not presented to the district court." (quoting *Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir. 1983))); *Galinis v. County of Branch*, 660 F. App'x 350, 354 (6th Cir. 2016) (Boggs, J.) ("Because Pollack failed to raise [certain] arguments before the district court, and this is not an exceptional circumstance, we decline to give him a second bite at the apple, and we hold that his novel arguments concerning qualified immunity are forfeited.").